COURT
OF APPEALS

SECOND DISTRICT
OF TEXAS

FORT WORTH

 

 

NOS.
2-07-086-CR

         2-07-087-CR

 

BRYAN ALBERT BELL                                                           APPELLANT

A/K/A
BRYAN A. BELL

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

FROM
THE 372ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

MEMORANDUM
OPINION[1]

 

                                              ------------

 

I. 
Introduction








Appellant Bryan Albert Bell appeals his convictions for aggravated
assault with a deadly weapon.  A jury
found Bell guilty of assaulting two men with a knife, and the trial court
sentenced him to thirteen years= imprisonment.  In two issues,
Bell claims that the evidence is legally and factually insufficient to support
the convictions in light of the evidence of his self-defense claim.  We will affirm.

II. 
Factual and Procedural Background

On the evening of May 22, 2006, there was a physical altercation at
the Rub-a-Dub car wash in Fort Worth. 
Four men were involved in the altercation.  Three of the menCMark Briles, Mark Keuhn, and Troy KoschnickCwere close friends who were on their way to get something to eat after
watching a basketball game on television at a local bar.  The other manCBryan BellCwas a
homeless man who had a campsite close to the car wash. 

Although the testimony at trial varied as to who instigated the
incident, Keuhn, Koschnick, and Bell ultimately ended up in a physical
altercation.  During the fight, Bell used
a pocket knife and injured both Keuhn and Koschnick.   The State charged Bell with aggravated
assault with a deadly weapon of both Keuhn and Koschnick.  The court=s charge provided the jury with an instruction on self-defense in
connection with both offenses.  The jury
nonetheless found Bell guilty, and the trial court sentenced him to thirteen
years= imprisonment for each offense, to be served concurrently.  Bell now appeals.

III. 
Sufficiency of the Evidence








In two issues, Bell contends that the evidence is legally and
factually insufficient to support his convictions for aggravated assault with a
deadly weapon because the evidence demonstrates that he acted out of
self-defense when he struck the two men with the knife.  

A person commits aggravated assault is if he intentionally, knowingly,
or recklessly causes bodily injury to another and uses or exhibits a deadly
weapon during the commission of the assault. 
Tex. Penal Code Ann. '' 22.01(a)(1), 22.02(a) (Vernon Supp. 2007).

The use of deadly force in self-defense, however, can serve as a
defense to otherwise criminal behavior, such as aggravated assault.  In that regard, the law in effect at the time
of the assaults in this case provided,[2]

(a) A
person is justified in using deadly force against another:

 

(1)
if he would be justified in using force against the other under Section 9.31;[3]








(2)
if a reasonable person in the actor=s situation would not have
retreated; and

 

(3)
when and to the degree he reasonably believes the deadly force is immediately
necessary:

 

(A)
to protect himself against the other=s use or attempted use of
unlawful deadly force; or

 

(B)
to prevent the other=s
imminent commission of aggravated kidnaping, murder, sexual assault, aggravated
sexual assault, robbery, or aggravated robbery.

 

Act
of May 27, 1995, 74th Leg., R.S., ch. 235, ' 1, sec. 9.32, 1995 Tex.
Gen. Laws 2141, 2141 (amended 2007).

 

A.     Standard of Review and Applicable Law for
Legal Sufficiency                       Review
of a Self-Defense Claim

 

In reviewing the legal sufficiency of the evidence to support a
conviction, we view all the evidence in the light most favorable to the
prosecution in order to determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).








This standard gives full play to the responsibility of the trier of
fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Clayton, 235 S.W.3d at 778. 
The trier of fact is the sole judge of the weight and credibility of the
evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 2006); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App.
2000).  

Thus, when performing a legal sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the fact-finder.  Dewberry
v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1131 (2000).  Instead, we Adetermine whether the necessary inferences are reasonable based upon
the combined and cumulative force of all the evidence when viewed in the light
most favorable to the verdict.@  Hooper v. State, 214
S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the fact-finder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.








A defendant has the burden of producing some evidence to support a
claim of self-defense.  Zuliani v.
State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).  After the defendant has introduced some
evidence of a defense, the State bears the burden of persuasion to disprove
it.  Id.; Saxton v. State,
804 S.W.2d 910, 913B14 (Tex.
Crim. App. 1991); Dotson v. State, 146 S.W.3d 285, 291 (Tex. App.CFort Worth 2004, pet. ref=d).  This burden does not
require the State to produce evidence disproving the defense; it requires only
that the State prove its case beyond a reasonable doubt.  Zuliani, 97 S.W.3d at 594; Saxton,
804 S.W.2d at 913; Dotson, 146 S.W.3d at 291.  To determine the legal sufficiency of the
evidence to disprove a nonaffirmative defense, such as self-defense,[4]
the appellate court asks whether, after viewing all the evidence in the light
most favorable to the prosecution, any rational trier of fact could have found
the essential elements of the charged offense beyond a reasonable doubt and
also could have found against the appellant on the self-defense issue beyond a
reasonable doubt.  Saxton, 804
S.W.2d at 914; Dotson, 146 S.W.3d at 291.

B.     Standard of Review and Applicable Law for
Factual Sufficiency                     Review
of a Self-Defense Claim

 








When reviewing the factual sufficiency of the evidence to support a
conviction, we view all the evidence in a neutral light, favoring neither
party.  Watson v. State, 204
S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d
795, 799 (Tex. Crim. App. 2005).  We then
ask: (1) whether the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the fact-finder=s determination is clearly wrong and manifestly unjust; or (2) whether
conflicting evidence so greatly outweighs the evidence supporting the
conviction that the fact-finder=s determination is manifestly unjust. 
Watson, 204 S.W.3d at 414B15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  Under the first prong, we cannot
conclude that a conviction is Aclearly wrong@ or Amanifestly unjust@ simply because, on the question of evidence admitted, we would have
voted to acquit.  Watson, 204
S.W.3d at 417.  To reverse under the
second prong, we must determine, with some objective basis in the record, that
the great weight and preponderance of all the evidence, though legally
sufficient, contradicts the verdict.  Id.








Unless the record clearly reveals that a different result is
appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

Self‑defense is a fact issue to be determined by the jury.  Saxton, 804 S.W.2d at 913B14.  A guilty finding is an
implicit rejection by the jury of a defendant=s claim of self-defense.  Zuliani,
97 S.W.3d at 595.  An appellate court
therefore applies the traditional two-pronged Johnson factual
sufficiency analysis when an appellant challenges the factual sufficiency of
the evidence to support the jury=s verdict in light of presented self-defense evidence.  Id. at 595 (holding that Awhen a defendant challenges the factual sufficiency of the rejection
of a defense, the reviewing court reviews all of the evidence in a neutral
light and asks whether the State's evidence taken alone is too weak to support the
finding and whether the proof of guilt, although adequate if taken alone, is
against the great weight and preponderance of the evidence@); see Watson, 204 S.W.3d at 417; Guia v. State, 220
S.W.3d 197, 204 (Tex. App.CDallas 2007, pet. ref=d); accord Dotson, 146 S.W.3d at 292 (analyzing factual
sufficiency under former factual sufficiency standard of review). 

C.     The Evidence Presented at
Trial

1.     Mark Briles








Mark Briles was the first to testify. 
Briles stated that, on the night of May 22, 2006, he was with some
friends, including Keuhn and Koschnick, watching a basketball game at the local
bar.  During the game, Briles testified,
he and his friends each consumed approximately four beers but nothing to
eat.  Therefore, when the game ended
around 10:00 p.m., he, Keuhn, and Koschnick left the bar together in his car to
go to a restaurant.  The car=s windshield, however, was dirty and difficult to see through, so
Briles pulled into a car wash to rinse it off. 

Once parked in the car washing bay, Briles got out of the car, picked
up the metal wash wand, and tried to start the machine.  The car wash, however, was set up so that patrons
had to exchange a dollar for a token to activate the machines.  Briles testified that he was unsuccessfully
trying to get the dollar-to-token converting machine to accept a badly wrinkled
dollar when Bell approached him.  Bell
noticed that Briles could not get the token machine to accept his dollar; Bell
had a token and offered to exchange it for Briles=s dollar.  Briles told Bell, ANo.  Go away.@ 








According to Briles, however, Bell did not go away but instead
remained in the car wash bay.  This led
Briles to believe that Bell had not noticed the other two men sitting in the
car and that Bell was going to try to rob him. 
The other two men, however, very quickly made their presence knownCthey both stepped out of the car and reiterated Briles=s command for Bell to leave, but Bell stood his ground.  Briles turned his attention back to the token
machine.  He could not hear what anyone
was saying, but by the time he looked up, he saw Koschnick and Bell facing off,
with Koschnick falling backwards and Keuhn reaching over Koschnick=s shoulders pushing Bell back. 
Then, Briles saw Keuhn grab his own neck.  At that point, Koschnick had regained his
balance and punched Bell in the side of the head.  Then, Koschnick looked at Briles and said,AWe need to go.  Mark=s been cut.@ 

At that point, the three got back into the car to take Keuhn to the
hospital.  On the way to the hospital,
Koschnick noticed that he had also been cut. 
Later that night, Briles went back to the car wash with the police and
identified Bell as the man involved in the altercation. 

2.     Troy Koschnick

Koschnick was next to testify. 
He stated that he was in poor health on the night of the incident
because he had an enlarged heart, for which he had a defibrillator and took
eighteen pills daily.  He supported
Briles=s testimony that on the night of May 22, 2006, he, Briles, and Keuhn
were at a bar, drinking and watching a basketball game, and that afterwards
they went with Briles to go to a restaurant. 
Koschnick verified that they had consumed approximately four beers
each.  








Koschnick offered more detail as to how the altercation at the car
wash started.  He stated that he and
Keuhn were in the car waiting for Briles to clean the windshield when he
noticed Bell approach Briles.  He said
that, from his perspective, it looked like Briles turned Bell away but that
Bell kept advancing toward Briles.  Therefore,
Koschnick said, he got out of the car and cursed at Bell, telling him to
leave.  Bell, however, did not leave but
instead spoke back to Koschnick using foul language.  Koschnick and Bell then started walking
toward each other, which is when Keuhn got out of the car.  Neither Koschnick nor Bell slowed his
advance, and soon the two bumped chests. 
When the two bumped chests, Koschnick said, Bell simultaneously stabbed
Koschnick in the side.  Later, Koschnick
discovered that he had been cut between his kidney and spleen and required
fourteen sutures, but at the time, Koschnick did not feel the blade of the
knife and thought that Bell had merely punched him in the side.








As Koschnick and Bell bumped chests and when Bell stabbed Koschnick in
the side, Keuhn was standing behind Koschnick. 
When Keuhn saw Bell Ahit@ Koschnick,
he cursed at Bell, reached over Koschnick=s shoulders (causing Koschnick to lose his balance), and pushed
Bell.  Koschnick, who was still trying to
regain his balance, did not see what happened between Keuhn and Bell but heard
Keuhn yell, AI=m cut.  I=m cut.  He cut my jugular.  He cut my jugular.@  Koschnick then regained his
balance and punched Bell in the side of the head so hard that, according to
Koschnick, he broke his hand.  Koschnick=s punch knocked Bell off balance long enough for Koschnick to look at
Keuhn and then tell Briles that Keuhn was cut and needed emergency
treatment.  Koschnick testified that
during the whole incident, he did not have any weapons on him and that neither
he nor Keuhn ever grabbed Bell=s arms or restrained him in any way. 

3.     Mark Keuhn

Mark Keuhn additionally testified at trial, backing up the testimony
of Briles and Koschnick.  Keuhn said
that, on the night of the incident, he stood six feet tall and weighed 270
pounds.  He was forty years old and, like
Koschnick, had an enlarged heart.  Keuhn
corroborated Briles and Koschnick=s testimony about being at the bar, watching basketball, leaving with
Briles to go get food, and stopping at the car wash to clean the
windshield.  His testimony differed as to
what time they left the bar (he said it was around 9:00 or 9:30 p.m.) and how
many beers he had consumed (he said he had drunk approximately six). 








At the car wash, Keuhn testified, after Bell and Briles spoke,
Koschnick got out of the car.  Koschnick
told Bell to leave, but Bell refused, saying that he did not have to
leave.  The argument between the two got
heated and they began walking towards each other.  Bell was becoming angered by Koschnick=s insistence that he leave, and, despite Koschnick=s demands, Keuhn said, A[Bell] wouldn=t
leave.  He just wouldn=t leave us alone.@  By now, the two were arguing
face-to-face, so Keuhn, who was concerned that the agitation would have an
adverse effect on Koschnick=s bad heart, got out of the car to get in between the two.

Keuhn approached Koschnick and Bell, reached over Koschnick=s shoulder, and put one hand on each man, attempting to push them
apart.  Keuhn testified that he then
turned to Koschnick and said, ADon=t mess with
him.  Get out of here.  It ain=t even worth it.@  As he was turned, talking to Koschnick, Keuhn
said, Bell stabbed him in the neck. 
Keuhn looked back around at Bell, and, cursing, asked, AWhat are you doing?@  But Bell continued his assault
on KeuhnCstabbing him two more times in the chest, once in the arm, and
multiple times in the stomach.  Keuhn
later received sixty stitches and permanent scars from the knife wounds. 

By that point in the fight, Keuhn saw Koschnick hit Bell in the side
of the head with his fist before Koschnick grabbed Keuhn=s neck, saying, AWe=ve got to get you to the hospital.@  Keuhn testified that, as
Koschnick was tending to him, Bell was standing next to the men, still cursing,
and saying, AI=ll kill all of y=all.@  The three friends then got
back into the car and went to the hospital. 








Keuhn testified that Bell was never restrained, and that, even though
they were next to a busy drive-thru restaurant, Bell never sought any help or
tried, in any way, to retreat.  In fact,
Keuhn said that he Awasn=t even worried about [Bell] . . . [;] he was angry, but he just didn=t look like he would be that type of person.@  Had he known that Bell was so
volatile, Keuhn stated, he never would have gotten near him.

4.     Bryan Bell

Bell testified in his own defense about what transpired on the night
of May 22, 2006.  Bell was forty five
years old when the incident happened, stood five feet, nine inches tall, and
weighed 215 pounds.  Bell testified that
he saw a man having trouble with the money machine and offered an even
token-for-dollar trade.  The man (Briles)
told him Ano@ and said AYou better
get out of here.@  Bell said, AWell, all right, you don=t got to be such a jerk about it.@  When Bell said this, Briles
looked at Bell like he was crazy.  Bell
thought Briles was going to hit him with the metal wash wand in his hand.  








Bell, who
had a twisted ankle and had difficulty walking, started to walk away, but
another man got out of the car, asked what was going on, and started to
approach Bell.  As this man (Koschnick)
approached Bell, another Ahuge man@ (Keuhn) got out of the car.  It
appeared to Bell that Keuhn, who was heavily slurring his words, was trying to
cut off Bell as he attempted to leave the car wash bay.  Bell and Koschnick then began to exchange
words, and Koschnick and Keuhn came up on either side of Bell.  Koschnick was yelling that Bell Abetter run,@ and Bell
was saying, AI can=t run.  I=ve hurt my foot.  I=ve got bad feet.  I can=t run.@  But he was nevertheless trying to get
away.  Then, as both Koschnick and Keuhn
were approaching him, Bell threw his hands up, felt someone grip his arm, and
felt fists beating him in the back of the head. 


At that
point, Bell remembered a knife that he had in his pocket.  Fearful for his life, Bell pulled out the
knife and started swinging it, hitting both men.  The men kept advancing, so Bell kept
swinging, and on the second swing he hit Keuhn in the neck with his knife.  Bell was struck at least one more time, so
badly that he saw stars.  Then the other
men retreated to the car, almost running over Bell before finally driving off.








At that
point, Bell panicked and dumped the knife in a ditch.  Then he went to the houses of two different
friends, hoping to get cleaned up and off the street for the night, but there
was no answer at either door, so Bell went back to his campsite.  Later that night, the police discovered
him.  Still panicked, Bell initially
denied everything to the police and only told them that he had gone to some
friends= houses that night but that no one was home.  After a while, however, Bell=s conscience got to him, so he called the police over to the car where
they had placed him and told them everything, including that he had acted in
self-defense. 

 

 

5.     Dr. Marc Krouse

Dr. Krouse
reviewed the emergency room records of Koschnick and Keuhn and testified that
the blood-alcohol level in both men was well over the legal limit on the night
of the altercation with Bell.  He
additionally stated that such intoxication could increase aggressiveness in an
individual.  As to the actual injuries
sustained during the fight, Dr. Krouse verified that both Koschnick and Keuhn
were injured with a knife.  He testified
that none of the wounds, except for the cut to Keuhn=s jugular vein, were life threatening but that the knife was
nevertheless used in a deadly manner.  He
also testified that a blow with a fist to the side of the head could be fatal,
but that the X-rays of Koschnick=s hand revealed that he had no fractures in his hand on the night of
the incident.

6.     Officer Christopher Watts








Officer
Watts testified that he investigated the scene after being dispatched to the car
wash around 11:00 p.m. on the night of May 22, 2006.  Officer Watts said that he and another
officer discovered Bell sleeping in an enclave behind a transmission shop
adjoining the car wash.  When questioned
about his whereabouts at the time of the altercation, Bell told the officers
that he had gone to a friend=s house but that no one answered when he knocked on the door, so he
returned to the enclave where the officers found him.  Despite Bell=s story, Office Watts suspected that Bell was involved in the earlier
altercation, so Officer Watts contacted Briles, who was still at the hospital
with his friends, and asked him to come to the scene to see whether the man the
police discovered was the one involved in the fight.  Bell was in the back of a police car when
Briles arrived and positively identified him as the man from the fight. 

After Briles
left, Bell called the police officers over to the car and said that he could
not live with his conscience and that he, in fact, had been at the car wash and
was in the fight.  He told the officers
that he thought the men were attacking him and that he used the knife to scare
the attackers and defend himself.  Bell
told the officers that he initially just cut the shirt of one of the men to
scare him but that when the other man grabbed his arms he started inflicting
more serious damage.  He then attempted
to show the police where he had thrown the knife but was unable to locate it.

D.     Legal and Factual Sufficiency of the
Evidence Presented








Concerning
Bell=s challenge to the legal sufficiency of the evidence, that Bell caused
bodily injury to both Keuhn and Koschnick and that he used a deadly weaponCa knifeCin doing so
was uncontradicted at trial. 
Additionally, the evidence was undisputed that Keuhn, Briles, and
Koschnick did not possess any weapons or use any weapons during the fight.  Viewing the evidence and testimony recited
above in the light most favorable to the jury verdicts, the jury could
rationally have believed the testimony of Keuhn, Briles, and Koschnick, all of
whom agreed that Bell refused to leave the area although he was repeatedly
asked to do so, that Bell was the aggressor in the altercation, and that Bell
was not restrained in any manner during the incident.  We hold that the evidence is legally
sufficient to prove beyond a reasonable doubt each of the elements of the
aggravated assaults (committed on Keuhn and Koschnick) alleged against Bell and
that the jury could have found against Bell on his self-defense issue beyond a
reasonable doubt by disbelieving Bell=s testimony.  See Saxton,
804 S.W.2d at 913B14; Lee
v. State, No. 01-06-00461-CR, 2007 WL 3293775 at *5 (Tex. App.CHouston [1st Dist.] Nov. 8, 2007, pet. filed) (holding evidence
legally sufficient to support murder conviction even in light of self-defense
evidence).  Accordingly, we
overrule Bell=s first
issue.








Turning to
Bell=s second issue challenging the factual sufficiency of the evidence to
support his convictions in light of his self-defense evidence, we  view all of the evidence in a neutral light
and determine whether the evidence supporting the convictions is so weak that
the jury=s determination in each case is clearly wrong and manifestly
unjust.  See Watson, 204 S.W.3d at
414B15.

As set forth
above, the State presented testimony that established every element of each
offense of aggravated assault with a deadly weapon and evidence that Bell did
not act in self-defense but rather continued his advance and independently
escalated the encounter by pulling out a knife when neither of the other two
men had attacked him.  While the record
contains two different versions of eventsCone supporting the jury=s convictions and one notCthe record does not reveal that the evidence supporting the
convictions (in the form of three eyewitnesses with matching stories) is so
weak that the jury=s
determination in either case was clearly wrong and manifestly unjust.  See Watson, 204 S.W.3d at 414B15.  Additionally, we must defer
to the jury=s
determination of the weight to be given to the contradictory testimony, and, in
this case, the jury clearly evaluated the credibility and demeanor of all the
witnesses and determined that Bell=s claim of self-defense should be rejected.  See Johnson, 23 S.W.3d at 8.








Viewing all
of the evidence in a neutral light, the evidence supporting Bell=s convictions for aggravated assault is not so weak that the
fact-finder=s guilty
verdicts are clearly wrong and manifestly unjust, nor does the conflicting
self-defense evidence provided by Bell so greatly outweigh the evidence
supporting the convictions that the fact-finder=s determinations are manifestly unjust.  See, e.g., Jaynes v. State, 216 S.W.3d
839, 852B54 (Tex. App.CCorpus
Christi 2006, no pet.) (holding evidence factually sufficient to support a
conviction for aggravated assault with a deadly weapon even in light of
self-defense evidence).  Because the
evidence is factually sufficient to support Bell=s convictions and the jury=s rejection of Bell=s claim of self-defense, we overrule Bell=s second issue.

IV.  Conclusion

Having
overruled both of Bell=s issues, we
affirm the trial court=s judgments.

 

SUE WALKER

JUSTICE    

 

PANEL B:   GARDNER,
WALKER, and MCCOY, JJ.

                                                    

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
April 17, 2008

 











[1]See Tex. R. App. P. 47.4.





[2]Although
the legislature has since amended sections 9.31 and 9.32, the offenses for
which the jury convicted Bell occurred on May 22, 2006, which was before the
September 1, 2007 effective date of the amendments.  Our analysis of Bell=s
appeal is therefore governed by the previous versions of these statutes.  See Act of June 19, 1993, 73rd Leg.,
R.S., ch. 900, ' 1.01,
sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 and Act of May 27, 1995, 74th
Leg., R.S., ch. 235, ' 1,
sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, both amended by Act of March
27, 2007, 80th Leg., R.S., ch. 1, ' 5, 2007 Tex. Gen. Laws
1, 2 (codified as an amendment of Tex.
Penal Code Ann. ''
9.31, 9.32) (stating that an offense committed before the act=s
effective date is governed by the sections in effect when the offense was
committed).





[3]Section
9.31, at the time that this statute was effective, established that a person is
justified in using force against another when and to the degree he reasonably
believes the force is immediately necessary to protect himself against the
other=s use
or attempted use of unlawful force.  See
Act of June 19, 1993, 73rd Leg., R.S., ch. 900, ' 1.01,
sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 (amended 2007).





[4]In
his brief to this court, Bell argues that we should treat self-defense as an
affirmative defense.  As the Court of
Criminal Appeals has established, Athe State has
the burden of persuasion in disproving the evidence of self-defense.@  Saxton, 804 S.W.2d at 913 (emphasis
added).  Therefore, we treat Bell=s
self-defense claim as a regular defense, not as an affirmative defense.  See id.; Ex parte Seibert, No.
WR-66432-01, 2007 WL 1139409, at *2 (Tex. Crim. App. Apr. 18, 2007) (not
designated for publication) (saying, A[s]elf-defense is not an
affirmative defense@).